IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 1, 2010

**IN THE MATTER OF ZMARIA C. ET AL.**

**Appeal from the Juvenile Court for Maury County**
**No. 78104, 78105     George L. Lovell, Judge**

**No. M2009-02440-COA-R3-PT - Filed August 24, 2010**

The parents of the two children at issue appeal the termination of their parental rights. The issues on appeal pertain to the trial court's findings that both parents were in substantial non-compliance with the permanency plans and that termination was in the children's best interests. Also at issue is whether the requirements of the Permanency Plans were not reasonable, related and relevant to the stated goals. We find the requirements of the Permanency Plans were appropriate and that the efforts of the Department of Children's Services constituted reasonable attempts to reunify the family. We also find the evidence clearly and convincingly supports the trial court's findings that the parents failed to substantially comply with the permanency plans and that termination of their parental rights is in the best interests of the children. We, therefore, affirm the termination of the parental rights of both parents.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Kevin S. Latta, Pulaski, Tennessee, for the appellant, Francoi C.

Samantha Guzall, Spring Hill, Tennessee, for the appellant, Darncia M.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; and Elizabeth C. Driver, Senior Counsel, for the appellee, Tennessee Department of Children's Services.

# OPINION

The Tennessee Department of Children's Services ("DCS") became involved with Francoi C. and Darnica[1] M. and two of their children, Zmaria[2] C. and Jaden C., on December 3, 2007, when DCS received a referral from Maury Regional Hospital regarding concerns the children were at risk. At the time Zmaria was four and Jaden was not yet one year old.

DCS Investigator Roseanne Humbert responded to the referral by meeting with Francoi C. and Darnica M. on December 4, 2007. During the meeting, Francoi identified himself as the father to the two children. He also stated, in the presence of Darnica, that she was not the mother of the children. Instead, he identified two women who resided in Michigan, Vera Spillman and Lisa Spillman, as the mothers of Zmaria and Jaden, respectively.[3] Darnica, who is the mother of both children, did not speak up to correct Francoi's misrepresentation and Francoi and Darnica continued the deception until September 2008.

Jaden, who had pneumonia, remained hospitalized for several days. On discharge, Francoi (hereinafter "Father") was instructed that Jaden required further medical care and he was instructed to follow up with the Ambulatory Care Clinic ("ACC") within three to five days.

When Ms. Humbert met with Father and Darnica again on December 13, 2007, to conduct a family services team meeting and to provide assistance, she discovered that Jaden had not been taken to ACC for the required follow-up appointment. Father and Darnica stated that transportation difficulties was the reason Jaden was not taken to ACC for a follow-up appointment.

---

[1]Darnica's name is spelled Darncia, Darnica and Darnicia interchangeably in the record. Darnica is the name used in her medical records; thus we have used that spelling.

[2]Zmaria's name is spelled Zamaria, Z'Maria and Zmaria interchangeably in the record. Zmaria is the spelling on her birth certificate.

[3]Father had no identification for the children at this time. Months later, DCS obtained the children's birth certificates. The State of Michigan Certificate of Live Birth for Zmaria identified "Vera Ann Spillman" as "Mother's Name at Time of This Birth." The Michigan Birth Certificate for Jaden identified "Lisa May Spillman" as "Mother's Name at Time of This Birth." The record before us does not reveal how the names of Darnica's cousins were listed as the "Mother's Name at Time of This Birth." However, the record does reveal why. The reason Darnica used her sisters' names, not her own, is explained later in this opinion.

To assist Father, Ms. Humbert referred him to a free community transportation service and she also agreed to look into daycare for the children. Jaden was taken to ACC on December 18, 2007, for his first follow-up appointment by Darnica, at which time he was given a refill of his prescription medicine. Darnica was advised to bring Jaden back in two weeks, or sooner if his condition worsened.

Ms. Humbert again visited the family on February 12, 2008, to discover that Jaden had not been taken to ACC for his second follow-up appointment. On February 15, 2008, Jaden was taken back to ACC, at which time he was found to be so ill that he had to be hospitalized overnight. He was discharged the following day and was scheduled to have a follow-up appointment within a week. Ms. Humbert met with the family again on February 20, 2008, and stressed how important it was for Jaden to be taken to his follow-up appointments at the instructed time.

On February 29, 2008, which was a week later than scheduled, Jaden was taken to ACC for his third follow-up appointment. It was during the February 29, 2008 examination that medical personnel at ACC became acutely concerned for Jaden's safety, which was due in part to the fact Jaden, who was only 13 months old, was observed sucking on a chicken bone. Of further concern to the medical staff was the fact Darnica saw nothing wrong with Jaden sucking on a chicken bone. In order to reduce the risk to Jaden, an ACC staff member provided the children with popsicles. Darnica was also instructed to not give Jaden the popsicle stick; instead, she was advised to only give Jaden pieces of popsicle after she broke them off of the stick. The foregoing warnings and instructions notwithstanding, when Nurse Practitioner Shari Jones walked back in the treatment room minutes later, she observed Jaden with the popsicle stick in his mouth. Nurse Practitioner Jones became so concerned about Mother's parenting skills that she contacted DCS and she also sent a letter expressing concerns for Jaden's welfare.

After receiving notice of what occurred during the February 29, 2008 appointment at ACC, Ms. Humbert removed the children; an order placing the children in the custody of DCS was entered on March 4, 2008. The children were placed with Resource Parent Barbara Walthour, and Ms. Karen Hall, a family service worker, was assigned to the case. Ms. Hall first met with Zmaria and Jaden on March 6, 2008.

On March 24, 2008, Ms. Hall met with Father to develop the first Permanency Plan and the primary goal of the plan was to return the children to "the parent." Father and Darnica were present but at the time of this meeting, Vera and Lisa Spillman, were still identified by Father and Darnica as the mothers of Zmaria and Jaden. Accordingly, a Permanency Plan was implemented for Father and the children. Under this plan, Father was required to: (1) have the children's documents sent from Michigan and provide them to DCS;

(2) establish paternity of the children; (3) participate in parenting assessment and follow all recommendations; and (4) provide a list of individuals who could help with transportation since he lacked any means of transportation. Because Darnica was living in the home with Father and the children, Darnica agreed to participate in the plan as well; her responsibility was to participate in a parenting assessment and follow all recommendations.

Father also agreed to provide information to help locate the two women identified as the children's mothers as well as the children's medical records and other documentation. Specifically, he was to provide the children's birth certificates, Social Security cards, and immunization records. When Father was asked whether the two women were related – since they shared the same last name, he stated he was not sure of their relationship to each, indicating they might be sisters or cousins; however, the record subsequently reveals that he knew they were not only sisters but Darnica's cousins.

Father failed to provide any of the children's records. As a result, DCS had the children immunized. Father also failed to provide information to locate Lisa and Vera Spillman, the women he and Darncia identified as the children's mothers. As a result, DCS made a diligent search for Lisa and Vera Spillman, but DCS's efforts to locate the women were unsuccessful.

Ms. Hall testified that she regularly took the children to visit Farther and Darnica. In June 2008, Father and Darnica moved into a different residence, one with no air conditioning. Because Jaden has asthma and a lack of air circulation would aggravate his breathing problems, Ms. Hall arranged for a community resource program to donate an air conditioner. After the air conditioning unit was delivered, the Guardian ad litem asked Father if there was anything else DCS could do for the family; he did not indicate any other needs.

On September 15, 2008, a revised Permanency Plan was developed for Father, which reflected many of the same responsibilities as the previous plan. There were three significant changes to the plan. One, Father was charged with the responsibility of finding a job because he lost his previous job. Two, additional parenting classes were required because Father's parenting assessment revealed that he was very unskilled at parenting. The third change pertained to the primary goal, which was initially the goal of "Return to the Parent." Due to the lack of success with the first plan and other major concerns, a secondary goal of adoption was included in the Revised Permanency Plan.

A dramatic development occurred in late September of 2008 when Ms. Hall was advised that Darnica was the children's mother, not Lisa or Vera Spillman. Ms. Hall learned this from Ms. Walthour, the Resource Parent, who stated that Darnica had told her that she, Darnica, was the mother of Zmaria and Jaden. Ms. Hall then asked Darnica if she was their

mother and Darnica admitted she was; she also admitted that she lied because she was afraid she would lose her children if DCS knew she was their mother given the State of Michigan had previously removed all of her other children.

During the next Child and Family Team Meeting ("CFTM"), Darnica consented to a DNA test; the DNA test results, received in January 2009, confirmed that Darnica was the biological mother of Zmaria and Jaden.

In the interim, DCS obtained a plethora of records from Michigan, which revealed that Darnica had a 20-year history of neglecting children, drug abuse, and possible mental retardation. It also revealed that Darnica gave birth to nine children prior to Zmaria and Jaden and that all of her children were removed from her custody.[4]

A third Permanency Plan was developed on March 24, 2009. This plan required Darnica (hereinafter "Mother") and Father to participate in psychological evaluations, alcohol and drug assessments, a parenting assessment and follow recommendations, and to obtain and maintain a job and comply with child support orders.

At the time of trial, neither parent had a job,[5] neither of them had completed a drug and alcohol assessment, nor had they completed a psychological evaluation.[6] While the parents participated in scheduled visits with the children, Ms. Hall noted several problems related to their lack of parenting skills. Father would not interact with Zmaria; when she tried to engage him to play, he ignored her. Ms. Hall made special arrangements for Zmaria to visit her parents on her birthday, as they had requested; however, when she arrived with Zmaria, the parents were nowhere to be found. Because Zmaria was very upset that her parents had forgotten her birthday, when the children were returned to Ms. Walthour, she arranged an impromptu party for Zmaria. During visits with her parents, Zmaria often plead with Ms. Hall to stay with her the entire visit. On several occasions, Ms. Hall had to reprimand Mother about inappropriate comments she made to Zmaria, specifically disparaging comments about Ms. Walthour. On numerous occasions the parents had

---

[4]Father has eight children, seven with Darnica. Neither parent has custody of any of their children.

[5]Mother has a legal means of income in that she receives Social Security Disability payments from an injury she sustained while pregnant with another child.

[6]Mother attended one mental health intake at Centerstone; however, she refused the services that were offered to her, which included therapy and case management. Mother indicated that transportation was a main concern with getting to the center; however, Ms. Hall informed her that TennCare would provide her with transportation as long as she called in advance. Ms. Hall also told Mother that if that did not work, Mother could call Ms. Hall at the office, and she would take her to Centerstone.

indicated they would provide breakfast for the children during their visits, but when they arrived, they either did not provide any food or they provided only junk food.

An adjudicatory hearing was held on May 4, 2009, following which the trial court determined the children were dependent and neglected within the meaning of the law pursuant to Tenn. Code Ann. § 37-1-103 (A), (F) and (G). The court also found that there were no reasonable services which could have prevented the necessity of Zmaria and Jaden's removal and that it was in the best interests of the children to remain in the temporary legal custody of DCS. Both parents agreed to the adjudication and consented to the children remaining in the temporary legal custody of DCS. The parents further agreed to ratify the Permanency Plan of March 24, 2009.[7] The order was entered on September 30, 2009.

DCS filed the Petition to Terminate Parental Rights as to both parents on July 13, 2009. The case was tried on October 2, 13, and 19, 2009. Following completion of the trial, the trial court terminated Mother and Father's parental rights on the statutory grounds of abandonment for failure to provide a suitable home, substantial noncompliance with the permanency plans, and persistent unremedied conditions that prevented the children's return to their parents' care, and the finding that termination was in the children's best interest.

In an order entered on October 30, 2009, the trial court made the following findings:

- [T]he testimony of the Department's witnesses is credible.
- [The Parents] lied to the Department regarding maternity in an effort to keep the Department from discovering their history in Michigan regarding removal and termination of their other children.
- The Department made reasonable efforts and attempts to provide services, however, until January 2009, those services were directed towards individuals who were not the mothers of the children.
- [The Parents] demonstrate a lack of parenting skills, an inability to parent the children appropriately, a history of medical neglect and harm from such neglect due to not following up with serious medical attention needed for a one year old, an inability to comprehend the appropriate parental responses necessary for the age and development of the children, the inability to recognize the harm the children can sustain when they are no appropriately attended to, and a clear and

---

[7]A Revised Permanency Plan was developed on August 15, 2009, between the date of the Adjudicatory hearing and order regarding dependency and neglect. The primary goal of the August 15, 2009 Plan was Adoption. Both parents agreed to their responsibilities under the Revised Plan as they had done with the previous 3 plans; however, they objected to the goal of adoption.

convincing demonstration of the breakdown of parental responsibility for providing for even the most basic necessities of the children.

- [The Parents] have demonstrated little to no progression in their ability to parent their children despite multiple services in the state of Michigan and Tennessee, and multiple sets of parenting classes and assessments, therapeutic counseling services, counseling intakes and counseling services, assistance in providing air conditioners, beds, mattresses, and finding houses.

- [The Parents] have shown a lack of concern to follow through in their permanency plans and obtain or complete the services recommended by the Department including employment for [Father], means of transportation and/or identifying a supportive social network to assist in meeting transportation needs, mental health/psychological evaluations and following up with the recommendations for both parents, alcohol and drug assessments and following up with the recommendations, and additional parenting classes and counseling services as recommended by their latest parenting assessments.

- [T]he testimony of [Father] and [Mother] reflected irresponsibility in providing truthful information to the Department and contracted community agencies to effectively provide services for reunification of the family.

Based on the above findings, the trial court terminated Mother's and Father's parental rights to Zmaria and Jaden. Both parents filed timely appeals.

## ANALYSIS

Parents have a fundamental right to the care, custody and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993). This right is superior to the claims of other persons and the government, yet it is not absolute. *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006).

Parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). The petitioner has the burden of proving that there exists a statutory ground for termination, such as abandonment or failing to remedy persistent conditions that led to the removal of the child. Tenn. Code Ann. § 36-1-113(c)(1); *Jones*, 92 S.W.3d at 838. Only one ground need be proved, so long as that ground is proved by clear and convincing evidence. *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). In addition to proving one of the grounds for termination, the petitioner must

prove that termination of parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re F.R.R.*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000) (holding a court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child). Therefore, a court may terminate a person's parental rights if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is clearly and convincingly established that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Whether a statutory ground has been proved by the requisite standard of evidence is a question of law to be reviewed *de novo* with no presumption of correctness. *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008) (no Tenn. R. App. P. 11 application filed) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810).

ISSUES

The parents present several issues on appeal. Mother contends the trial court erred in finding that she abandoned the children by failing to provide a suitable home. Father contends the requirements of the Permanency Plans were not reasonably related and relevant to the stated goals. Both parents contend the evidence is insufficient to support a finding that persistent conditions prevented the safe return of the children to the parents, that the Department made reasonable efforts to reunify them with their children, and that termination of their parental rights was in the best interest of the children.

Abandonment

The trial court found that Mother abandoned her children under Tenn. Code Ann. § 36-1-102(1)(A)(ii) by failing to provide a suitable home. Mother contends this was error; DCS concedes this issue.

For purposes of terminating the parental rights of a parent, abandonment by failing to provide a suitable home means:

> The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency,

-8-

that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date; . . .

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

To establish the ground of abandonment due to a parent's failure to provide a suitable home for the children, *DCS must establish that the children were removed from the parents' home by order of the court in which the children were found to be a dependent and neglected child at least four months prior to the filing of the petition to terminate the parent's rights. See* Tenn. Code Ann. § 36-1-102(1)(A)(ii). DCS concedes in its brief, and the record confirms, there was "no four month period after the adjudication to allow for the application of this statute."

The adjudicatory order of the court finding the children dependent and neglected and authorizing the removal of the children was entered on September 30, 2009.[8] The petition to terminate the parental rights of Mother and Father was filed on July 13, 2009, months prior to entry of the adjudicatory order. Therefore, an essential element of the ground of abandonment was not established.

<u>Persistence of Conditions</u>

The trial court found conditions persisted that prevented the safe return of the children to the parents. The parents contend this was error, and again, DCS does not disagree.

---

[8]In a proceeding to declare child dependent, neglected, or abused, the statutes and rules provide for three types of hearings: (1) preliminary hearings; (2) adjudicatory hearings; and (3) dispositional hearings. *In re Audrey S.*, 182 S.W.3d 838, 874 (Tenn. Ct. App. 2005) (citations omitted). An adjudicatory hearing is done to determine whether the allegations of dependency, neglect, or abuse are true. *Id.* The children were taken into protective custody and an order to that effect was entered on March 4, 2008; however, the adjudicatory hearing did not occur until May 4, 2009 and the order in which the children were found to be dependent and neglected was not entered until September 30, 2009.

The initiation of termination proceedings may be based upon any ground listed in subsection (g) of Tenn. Code Ann. § 36-1-113. The ground of persistent conditions is one of the listed grounds. Tenn. Code Ann. § 36-1-113(g)(3). Essential elements of the ground of persistent conditions, as specified in Tenn. Code Ann. § 36-1-113(g)(3), are that the children have been removed from the home of the parents by order of a court for a period of six (6) months and:

> (A)  The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (B)  There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (C)  The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . .

Subsection (g) of Tenn. Code Ann. § 36-1-113 clearly requires that *the children have been removed from the custody of the parents by order of the court for no less than six months before the termination action may be initiated. See* Tenn. Code Ann. § 36-1-113(g)(3)*; see also In re Audrey S.*, 182 S.W.3d 838, 874  (Tenn. Ct. App. 2005) (finding that the court order must be based on a judicial finding of dependency, neglect, or abuse). As noted above, the adjudicatory order of the court finding the children dependent and neglected and authorizing the removal of the children was entered on September 30, 2009. The petition to terminate the parental rights of Mother and Father was filed prior to entry of the adjudicatory order. Accordingly, the children had not been removed by order of the court when this action was initiated. As a consequence, an essential element of the ground of persistent conditions was not established.

THE DEPARTMENT'S EFFORTS

Both parents contend the Department failed to exert reasonable efforts to assist them to reunify with their children. Father additionally asserts that the requirements of the permanency plans were not reasonable, related or relevant to the stated goals of the permanency plans. DCS vigorously defends these contentions on appeal. Considering the unique facts of this case, particularly the dishonesty of both parents, we have determined the requirements of the permanency plans were reasonable, related and relevant to the stated goals and that DCS exerted reasonable efforts.

DCS is the agency responsible for the care and protection of dependent and neglected children. Because of the importance of the family unit, DCS has the "responsibility to make reasonable efforts to reunify children and their parents after removing the children from their parents' home." *In re Tiffany B*., 228 S.W.3d 148, 157-58 (Tenn. Ct. App. 2007) (citing Tenn. Code Ann. § 37-1-166). To satisfy this "reasonable efforts" responsibility, DCS must exercise reasonable care and diligence "to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). Factors the courts use to determine the reasonableness of those efforts include: (1) the reasons for separating the parents from their children, (2) the parents' physical and mental capabilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts. *In re Tiffany B.*, 228 S.W.3d at 158-59 (citing *In re Giogianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006) (footnote omitted).

Our analysis of the reasonableness of the requirements in the permanency plans and DCS's efforts to reunify this family must start with the recognition that Father and Mother engaged in deceit for more than nine months to hide the fact that Darnica is the mother of both children. This protracted deceit greatly hindered DCS's ability to fashion an effective and appropriate permanency plan. As this court has repeatedly noted, DCS is not required to make "herculean" efforts. *See In re A.R.*, No. M2007-00618-COA-R3-PT, 2007 WL 4357837, at *5 (Tenn. Ct. Ap. Dec. 13, 2007) (citing *In re M.B.*, No. M2006-02063-COA-R3-PT, 2007 WL 1034676, at *5 (Tenn. Ct. App. Mar. 30, 2007)). Moreover, the responsibility to exert reasonable efforts to facilitate reunification of the family "does not rest solely on the Department's shoulders. Parents must make reasonable efforts to rehabilitate themselves and to remedy the conditions that required them to be separated from their children." *State v. B.B.M.*, 2004 WL 2607769, at *7 (Tenn. Ct. App. Nov. 17, 2004). Because of the parents' deceit, the first two permanency plans crafted by DCS could only focus on assisting Father to reunify with the children. DCS's inability to fashion appropriate requirements that included Mother and Father is the fault of the parents. It was the direct result of a premeditated lie perpetrated by both parents. We, therefore, find that the deceit employed by Father and Mother excused DCS from any deficiencies there may exist in the reasonableness of its requirements of Father or Mother and the efforts it exerted until the truth came out, the very important fact that Darnica is the mother of Zmaria and Jaden.

The foregoing notwithstanding, we will analyze the efforts made by DCS, efforts we find to have been reasonable under the unique circumstances of this case.

Prior to taking the children into its custody, the DCS case manager's first visit with the family occurred on February 28, 2008, at which time the family was referred to the HUGS program. Unfortunately, HUGS could not assist the family until the children's birth certificates were obtained, which Father failed to provide. DCS provided a crib and crib mattress for Jaden and a mattress and toddler bed for Zmaria. Ms. Humbert brought clothing and toys for the children for Christmas and attempted to find day care for the children but could not find any agency to transport the children to daycare on a regular basis.

DCS crafted Permanency Plans on March 24, 2008; September 15, 2008; March 24, 2009; and August 15, 2009. Because of the parents' deception regarding the mother's identity, the first two plans were focused on Father's responsibilities and concerns for the children's safety due to his lack of proper parenting skills. Father did little to cooperate with DCS. Although he attended visitations and made efforts to attend parenting assessments and classes, he failed to provide the children's medical records and other documentation, and most importantly, he failed to be honest with DCS as to mother's identity.

Once Darnica was identified as the children's mother, the Permanency Plans were revised to include her. When DCS learned of Mother's troubled history in Michigan, those records were requested, and it became evident that she had a history of mental illness, unskilled parenting, and drug and alcohol abuse that needed to be addressed. DCS took this information into account when developing the March 24, 2009 Permanency Plan. The new plan required both parents to: (1) participate in psychological evaluations, an alcohol and drug assessment, and a parenting assessment, and follow all recommendations; (2) obtain and maintain a stable source of income and provide proof of income to DCS; and (3) comply with child support orders.

Father contends that the children were removed from the home due to concerns about medical neglect and that the additional requirements of psychological assessments and alcohol and drug assessments were not reasonable, related and relevant to the stated goals of the Permanency Plans as required by Tenn. Code Ann. §§ 36-1-113(k) and 37-1-166(d)(2). The reason the initial Permanency Plan did not address the issues of mental health and drug and alcohol abuse is because the parents deceived DCS regarding Mother's identity and therefore DCS was not aware of the family's troubled history. Once those issues came to light, DCS acted promptly to revise the plan to address these issues, including Mother's mental illness, which had gone untreated. However, the revised plan was thwarted when Mother refused mental health treatment. Moreover, the parents did not submit to random drug tests as required by the Revised Permanency Plan and Father failed to obtain employment; he also failed to provide proof that he applied for jobs.

As we stated above, considering the unique facts of this case, particularly the dishonesty of both parents, we find the requirements of the permanency plans were reasonable, related and relevant to the stated goals and that DCS exerted reasonable efforts in its attempt to reunify the family.

BEST INTERESTS OF THE CHILDREN

We have affirmed the finding of one ground for termination of the parental rights of both parents and only one ground is required.[9] Thus, we now turn to the issue of whether DCS proved by clear and convincing evidence that termination of the parents' rights is in the best interests of the children. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 810; *In re Valentine*, 79 S.W.3d at 546 (Tenn. 2002).

Factors to be considered include, but are not limited to those stated in Tenn. Code Ann. § 36-1-113(I). We have determined that three of the statutory factors have been established by clear and convincing evidence. One, the parents failed to make an adjustment of circumstance, conduct, or conditions to make it safe and in the children's best interests to be in the parents' home. *See* Tenn. Code Ann. § 36-1-113(i)(1). Two, a change of caretakers and physical environment will have an adverse effect on the children's emotional, psychological and medical condition. *See* Tenn. Code Ann. § 36-1-113(i)(5). Three, the mental and emotional status of the parents is detrimental to the children, and it prevents the parents from effectively providing safe and stable care and supervision for the children. *See* Tenn. Code Ann. § 36-1-113(i)(8).

Mother and Father failed to exhibit any parental responsibility for the proper care and safety of their children. The protracted deceit by the parents about the children's mother delayed permanency of the children and resulted in the children forming an earlier attachment with their foster parent. The children have been living with a loving, caring and responsible foster parent who wishes to adopt the children. The children have formed a bond with their foster parent and a change in caretakers and physical environment will have a negative effect of the children's emotional and psychological condition. The children need to be given an opportunity to grow in a caring environment, and being adopted by the foster parent will afford that opportunity.

We, therefore, affirm the finding of the trial court that termination of the parental rights of Mother and Father is in the children's best interests.

---

[9]One ground for termination of parental rights is sufficient under Tenn. Code Ann. § 36-1-113(c). *See In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *see also In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

**IN CONCLUSION**

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the Department of Children's Services due to the parents' indigency.

_____
FRANK G. CLEMENT, JR., JUDGE